**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
**-------------------------------------------------------------**

**ROYAL & SUN ALLIANCE**
**INSURANCE PLC,**

     **Plaintiff,**

  **- against -**

             **09 C 5935**
             **MEMORANDUM OPINION**
             **AND ORDER DENYING IN**
             **PART, AND GRANTING IN**
             **PART, MOTIONS IN LIMINE**

**UPS SUPPLY CHAIN SOLUTIONS, INC.,**
**WORLDWIDE DEDICATED SERVICES, INC.,**
**and INTERNATIONAL MANAGEMENT**
**SERVICES COMPANY, INC.,**

      **Defendants.**
**----------------------------------------------------------**

**MARVIN E. ASPEN**, United States District Judge:

   Presently before us are nine motions in limine filed by Plaintiff Royal & Sun Alliance

Insurance PLC ("Royal Sun") and Defendant International Management Services Company, Inc.,

("IMSCO"), in preparation for the upcoming trial in this case.[1]

   We presume familiarity with the nature of the dispute and the underlying record.  Suffice

it to say for present purposes that the parties contest whether the accident spawning this case was

unavoidable or due to the driver's medical condition.  Royal Sun alleges that the driver, James

Crews, who died two weeks after the crash, suffered from obstructive sleep apnea, a condition

that might have affected his driving on the night of the accident.  Various legal theories in the

---

[1] Motions in limine previously decided by Judge Swain are of record and need not be
raised again prior to trial.

case, as well as pending motions, thus concern Crews' health and attentiveness.[2]

## STANDARD

"A district court's inherent authority to manage the course of its trials encompasses the right to rule on motions *in limine*." *Highland Capital Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173, 176-77 (S.D.N.Y. 2008) (*citing Luce v. Unites States*, 469 U.S. 38, 41 n.4, 105 S. Ct. 460, 463 (1984)).  "The purpose of an *in limine* motion is to aid the trial process by enabling the [c]ourt to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, the trial." *Palmieri v. Defaria*, 88 F.3d 136, 141 (2d Cir. 1996) (internal quotation omitted); *see also Ventura Assocs., Inc. v. Int'l Outsourcing Servs., Inc.*, No. 04 C 5962 & 04 C 10250, 2009 WL 691066, at *1 (S.D.N.Y. Mar. 17, 2009).  Because a ruling on a motion *in limine* is "subject to change as the case unfolds," this ruling constitutes a preliminary determination in preparation for trial. *Palmieri*, 88 F.3d at 139 (*quoting Luce*, 469 U.S. at 41, 105 S. Ct. at 163).

## ANALYSIS

### A.   EXPERT TESTIMONY

Six of the nine motions before us concern the parties' reliance on the testimony of expert witnesses.  Federal Rule of Evidence 702 permits the use of relevant testimony from a qualified expert so long as: "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."  Fed. R. Evid. 702; *see Nimely v. City of New York*, 414

---

[2] For example, Royal Sun contends that IMSCO's conduct, in allowing Crews to drive a commercial truck with sleep apnea, constitutes negligence per se.  (*See, e.g.*, Opp'n to Def.'s MIL re: Millman at 6–8.)

F.3d 381, 395–97 (2d Cir. 2005); *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 264–66 (2d Cir. 2002); *In re Fosamax Prods. Liability Litig.*, 645 F. Supp. 2d 164, 172–74 (S.D.N.Y. 2009). We are thus charged with "'the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597, 113 S.Ct. 2786, 2799 (1993)). In assessing the relevancy of proferred testimony, we look to Rule 401, which instructs that testimony is relevant if it "ha[s] any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401; *Amorgianos*, 303 F.3d at 265; *Tiffany (NJ), Inc. v. eBay, Inc.*, 576 F. Supp. 2d 457, 459 (S.D.N.Y. 2007).

To be deemed reliable, the proferred testimony must meet the above requirements of Rule 702 and rest on "good grounds, based on what is known." *In re Fosamax Prods. Liability Litig.*, 645 F. Supp. 2d 173 (quoting *Daubert*, 509 U.S. at 590, 113 S. Ct. at 2795). When evaluating the testimony's reliability, we "focus on the principles and methodology employed by the expert, without regard to the conclusions" reached and must exclude opinions that are not supported by the underlying data and principles. *Amorgianos*, 303 F.3d at 266; *see also Nimely*, 414 F.3d at 396–97; *Cedar Petrochems., Inc. v. Dongbu Hannong Chem. Co., Ltd.*, 769 F. Supp. 2d 269, 282 (S.D.N.Y. 2011); *In re Fosamax Prods. Liability Litig.*, 645 F. Supp. 2d at 173–74. Nonetheless, "in accordance with the liberal admissibility standards of the Federal Rules of Evidence, only serious flaws in reasoning or methodology will warrant exclusion." *In re Fosamax Prods. Liability Litig.*, 645 F. Supp. 2d at 173 (citing *Amorgianos*, 303 F.3d at 267). Rather, "vigorous cross-examination, presentation of contrary evidence, and careful

instruction . . . are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596, 113 S. Ct. at 2798; *Amorgianos*, 303 F.3d at 267.

Where an expert's methodology overcomes the hurdle of being based on a reliable process, remaining controversies as to the expert's methods and conclusions generally bear on the weight and credibility—but not admissibility—of the testimony. *See McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043 (2d Cir. 1995); *Mayancela v. Biro Mfg. Co.*, No. 08 C 245, 2010 WL 774942, at *3 (S.D.N.Y. Mar. 5, 2010). "If an expert's testimony lies within 'the range where experts might reasonably differ,'" it is the trier-of-fact who should "'decide among the conflicting views of different experts.'" *In re Fosamax Prods. Liability Litig.*, 645 F. Supp. 2d at 173 (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 153, 119 S. Ct. 1167, 1177 (1999)). When the fact-finder is the court, expert evidence should be quite freely admitted so that the judge may "have the benefit of live testimony and cross-examination to determine how much weight, if any, to give to the expert's conclusions."[3] *Joseph S. v. Hogan*, No. 06 C 1042, 2011 WL 2848330, at *2–3 (E.D.N.Y. July 15, 2011). Our discretionary rulings concerning the admissibility of expert testimony will not be disturbed unless deemed "manifestly erroneous." *Amorgianos*, 303 F.3d at 264–65 (quoting *McCullock*, 61 F.3d at 265). With these principles in mind, we turn to the motions *in limine*.

### 1.    Richard Millman, M.D.

Royal Sun has proposed the testimony of Dr. Millman, a physician and expert on sleep

---

[3] In addition, a *Daubert* hearing prior to a bench trial is likely to be unnecessary and inefficient. If a court "is not satisfied with the parties' examination of the witnesses at trial, [the judge] will have the opportunity to ask . . . questions, without the risk of influencing the jury, to determine whether the expert's opinion is sufficiently reliable." *Joseph S.*, 2011 WL 2848330, at *3.

disorders.  Dr. Millman is prepared to testify that Crews had obstructive sleep apnea, which was not recognized by either his employer or the examining physician who certified him to continue driving, Dr. Lee.  (Millman Report at 1.)  He states that "untreated sleep apnea would have placed [Crews] at a greater risk of dozing off or falling asleep at the wheel."  (*Id.*)  Dr. Millman opines that, based on Crews' physical characteristics, IMSCO and Dr. Lee should have suspected that Crews might have sleep apnea and evaluated him more thoroughly before allowing him to drive.  (*Id.*)  He ultimately concludes that IMSCO and Dr. Lee failed to exercise reasonable care in testing Crews to determine his driver safety.  (*Id.* at 1, 3–4.)  IMSCO objects to the testimony of Dr. Millman on several grounds, which we address briefly below.  (Def.'s MIL re: Millman at 8–14.)

IMSCO concedes that Dr. Millman is qualified to diagnose sleep apnea but contends that he has not done so with sufficient information here as to Crews.  (*Id.* at 9.)  Having reviewed Dr. Millman's education, experience and work history, we find that he is highly qualified to render opinions about sleep disorders.  (*See* Millman Report (c.v.).)  We have no quibble with either Dr. Millman's qualifications or the relevance of the proferred testimony.  Indeed, Dr. Millman's opinions are plainly relevant to the supposed causes of the accident and legal theories.  Based thereon, IMSCO's concerns essentially lie with the reliability of Dr. Millman's opinions.

IMSCO decries Dr. Millman's sleep apnea diagnosis.  IMSCO contends that Dr. Millman's diagnosis is unfounded because neither he, nor any other physician, performed a sleep study on Crews.  (Def.'s MIL re: Millman at 9–11.)  According to IMSCO, Dr. Millman's diagnosis is speculative because it is based on statistics, rather than sleep study results or personal examination, and it flies in the face of other testimony suggesting that Crews did not

have sleep apnea.[4]  (*Id.* at 5–11.)  While we agree with IMSCO that there is room to debate the

value of Dr. Millman's diagnosis in the context of all the available evidence, his opinion is

reliable and admissible.  Dr. Millman reviewed Crews' medical records, which provided the

undisputed data he used to evaluate the possibility that Crews had sleep apnea.  (Millman Report

at 1.)  Dr. Millman then relied on numerous medical studies and articles—nearly all of which are

unchallenged by IMSCO[5]—to reach his conclusion that an individual with Crews' height,

weight, neck thickness and medical history would have obstructive sleep apnea.  Indeed, Dr.

Millman helped conduct one such study, which found that individuals with Crews'

characteristics would have an 86% likelihood of suffering from this disorder.  (*Id.* at 3 (citing

Gary D. Foster et al., *Obstructive Sleep Apnea among Obese Patients with Type 2 Diabetes*,

32(6) Diabetes Care 1017–19 (June 2009), *available at*

http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2681024/?tool=pubmed).)  Even without

arguably more definitive sleep study results, Dr. Millman's diagnosis rests squarely "on good

grounds, based on what is known."[6]  *In re Fosamax Prods. Liability Litig.*, 645 F. Supp. 2d at

---

[4] For example, neither Crews' wife, nor co-driver, reported Crews as snoring heavily, appearing fatigued or falling asleep at the wheel, all of which would have been symptomatic of sleep apnea.  (Crews Dep. at 13–14, 29–31; Harrison Dep. at 19–20, 54–55.)  In addition, Crews' personal physician had never diagnosed him with sleep apnea.

[5] IMSCO objects to one particular study (Def.'s MIL re: Millman at 10), which according to Millman should have informed Dr. Lee that "truck drivers frequently have sleep apnea," (Millman Report at 2).  In light of the other references cited, that study does not appear to have been the driving force behind Dr. Millman's conclusions.  (*See* Millman Report at 1–3.)  Even if we disregard that study, however, Dr. Millman's opinions, which are based on numerous other materials, remain reliable.

[6] In making this determination, we need not rely on the disputed evidence that Crews was diagnosed with obstructive sleep apnea after the accident while being treated for his burns.  (*See* Opp'n to Def.'s MIL re: Millman at 3 & Eagan Decl., Ex. 2 (medical records).)

173 (quoting *Daubert*, 509 U.S. at 590, 113 S. Ct. at 2795).

IMSCO also disputes Dr. Millman's statement that "untreated sleep apnea would have placed [Crews] at a greater risk of dozing off or falling asleep at the wheel." (Millman Report at 1.) This opinion, however, is also based on his experience and solid medical information. (*Id.*; *see also* Opp'n to Def.'s MIL re: Millman at 5.) We find no "serious flaws" with Dr. Millman's reasoning here. *In re Fosamax Prods. Liability Litig.*, 645 F. Supp. 2d at 173 (citing *Amorgianos*, 303 F.3d at 267). IMSCO will have the opportunity at trial to flesh out any perceived vagueness with this testimony and attack Dr. Millman's opinions.

Finally, IMSCO claims that Dr. Millman lacks the expertise to conclude that IMSCO and Dr. Lee[7] failed to exercise reasonable care when evaluating Crews' ability to drive a truck. (Def.'s MIL re: Millman at 7, 12.) IMSCO argues that Dr. Millman's report does not show him qualified to evaluate whether IMSCO complied with the applicable standards of care. To the contrary, Dr. Millman appears to have relied on the recommended standards of care issued by several organizations, and IMSCO has not attacked these sources or their methodologies (Millman Report at 2.) We acknowledge that there may be differences of opinion on this point; for example, the standard of care expected of IMSCO in its industry as a practical matter may differ from the standard of care sought by physicians and trade groups. But any such discrepancies bear on the weight and credibility of testimony, not admissibility. *McCullock*, 61 F.3d at 1043; *Mayancela*, 2010 WL 774942, at *3. Accordingly, we allow Dr. Millman's opinion, subject to cross-examination and rebuttal by IMSCO's witness who will to testify as to

---

[7] IMSCO notes that Dr. Lee was employed by Concentra Medical Center and argues in passing that it is not responsible for any failure on her part to diagnosis sleep apnea. We need not address that issue at this juncture. (Def.'s MIL re: Millman at 6, 14.)

accepted industry and corporate practices.  The motion to exclude Dr. Millman is denied.

### 2.      William Fogarty, Ph.D.

IMSCO seeks to exclude the testimony of Dr. William Fogarty, Royal Sun's proposed expert witness on accident reconstruction.  (Def.'s MIL re: Fogarty.)  Based on his expert report, Dr. Fogarty will testify that the physical evidence from the accident—specifically, the dimensions of the road, the location and characteristics of the tire marks, and the impact angle—is "consistent [with] Mr. Crews act[ing] in a manner similar to one in a transitional phase toward sleep in his response, or lack thereof, to his vehicle's path of travel."  (Fogarty Report at 19.)

IMSCO argues that Dr. Fogarty, who holds a doctorate in civil engineering, is not qualified to render an opinion on "whether Mr. Crews was fatigued or not at the time of the accident."  (Def.'s MIL re: Fogarty at 9.)  But IMSCO's argument mischaracterizes the nature of Dr. Fogarty's proposed testimony.  In his report, Dr. Fogarty states that the "primary causal factor in this collision [was] 'Inattention.'"  (Fogarty Report at 19.)  Dr. Fogarty goes on to observe that "[t]he root cause of the inattention can be advanced to be any number of factors associated with the physical limitations that are associated with Mr. Crews by scientists or physicians."  (*Id.*)  It is only after this broad caveat that Dr. Fogarty concludes that the evidence is "consistent" with the conclusion that Mr. Crews "acted in a manner similar to one in a transitional phase toward sleep[.]"  (*Id.*)  Thus, as an initial matter, Dr. Fogarty is not proposing to state definitively that Mr. Crews fell asleep.  Instead, Dr. Fogarty will testify that the physical evidence accords with such a conclusion.

Given this understanding of his proposed testimony, Dr. Fogarty's qualifications are more

than adequate.  *See* Fed. R. Evid. 702 (requiring that an expert be qualified by "knowledge, skill, experience, training, or education").  Dr. Fogarty holds a doctorate in civil engineering and has taught on such topics as transportation engineering and accident reconstruction.  (Opp'n to Def.'s MIL re: Fogarty at 10.)  Furthermore, from 1969 to 1982, Dr. Fogarty was the principal investigator on a team that conducted research in to the cause of approximately 3,500 motor vehicle accidents for the National Highway Transportation Safety Administration.  (*Id.* at 11.)  Given his education and experience, Dr. Fogarty is sufficiently qualified in the field of accident reconstruction to evaluate the physical evidence in this case.

IMSCO also faults Dr. Fogarty for primarily relying on photographs of the scene and for failing to evaluate other evidence, such as Mr. Crews' work-rest history, shift regularity, and the state of his circadian rhythm, to determine whether Mr. Crews was asleep.  IMSCO's attempt to fault Dr. Fogarty for failing to adequately account for evidence pertaining to Mr. Crews' sleeping habits also misses the point of Dr. Fogarty's testimony.  Again, Dr. Fogarty's testimony pertains only to whether the physical evidence is consistent with Mr. Crews falling asleep.  Mr. Crews' physical characteristics and habits in the time leading up to the accident are beyond the scope of Dr. Fogarty's testimony, and Dr. Fogarty cannot be faulted for failing to address this evidence.  Royal Sun proffers other experts and evidence on the issue of whether the "root cause of [Mr. Crews'] inattention" was sleepiness.

In light of the intended scope of his testimony, Dr. Fogarty's methods are sufficiently reliable.  In his investigation, Dr. Fogarty used the data gathered from the scene of the accident as incorporated in the other experts' reports.  (Def.'s MIL re: Fogarty, Ex. 4 at 1.)  *See* Fed. R. Evid. 702 (requiring testimony "based upon sufficient facts or data").  This data included

measurements of the lanes in the area near the accident site, the location and length of certain tire

marks, and the impact angle of the tractor trailer.  (Fogarty Report at 14–15.)  To analyze the

data, Dr. Fogarty applied the "U.S.D.O.T., N.H.T.S.A. protocol . . . utilized nationally by MDAI

(Multidisciplinary Accident Investigation) teams[.]"  (*Id.* at 1.)  This protocol has apparently

been used "throughout the United States for decades in the conduct of tens of thousands of motor

vehicle collision events."  (*Id.*)  Assuming this information is true, Dr. Fogarty's methods are

reliable.  *See* Fed. R. Evid. 702 (requiring expert testimony to be "the product of reliable

principles and methods").

Lastly, Dr. Fogarty's testimony is obviously relevant.  Whether or not the physical

evidence accords with Royal Sun's theory that Mr. Crews fell asleep or was in the process of

doing so is of crucial importance.  Dr. Fogarty's proposed testimony will thus "assist the trier of

fact" in understanding the physical evidence gathered from the accident scene.  *Id.*  IMSCO's

motion is denied with respect to Dr. Fogarty.

### 3.     Paul Paxton

IMSCO also seeks to preclude the testimony of Paul Paxton.  Paxton is an experienced

truck driver retained by Royal Sun to evaluate IMSCO's theory of the accident.  Paxton prepared

three expert reports, which propound the following opinions.  First, it is "unlikely" that Crews

was forced off the road because Paxton never experienced such an incident in his 1.2 million

miles of professional driving.  (10/19/10 Paxton Report at 3–4.)  Second, Crews should have

been able to simply change lanes to avoid any crash with either another semi or the concrete

barrier.  (*Id.*; 11/15/10 Paxton Rebuttal Report at 3.)  Third, Crews was improperly driving in the

center lane of traffic, a trucking *faux pas* that contributed to the accident because it forced other

trucks to pass Crews on the right.  (12/1/10 Paxton Rebuttal Report at 3.)  IMSCO challenges

Paxton's qualifications, methodology and conclusions.  (Def.'s MIL re: Paxton at 5–9.)

Based on Paxton's extensive experience, we find that he is qualified to testify as an

expert.  That being said, we agree with IMSCO that not all of Paxton's proposed opinions fall

within his area of expertise.  While we acknowledge Paxton's exceptional driving record, the fact

that he was never cut off from the right by another truck has no bearing on the instant dispute.

Paxton's anecdotal testimony about his personal career does not make it more or less likely that

Crews was run off the road on the particular night in question.  We thus strike Paxton's opinion

on this point as irrelevant.

We also exclude Paxton's summary conclusion that Crews should have been able to

safely move into the inside left lane to avoid another vehicle without careening into the center

barrier.  On one hand, this observation is a waste of time: it seems fairly obvious that smoothly

and evenly changing lanes would have been the ideal solution to the dilemma posed here.

Moreover, Paxton's assertion that Crews should have been able to do so is unreliable.  Paxton

renders this opinion without any knowledge of the details of the crash itself.  While the parties'

experts disagree about the causes of the crash and many facts are unknown, Paxton did not even

review the experts' simulations or conclusions.  Paxton, like the rest of us, has no information

about the alleged movements of the unidentified "phantom" truck in relation to the movements of

Crews' truck.  His review of certain documents, and of the crash area itself from a moving

taxicab, does not strike us as a sufficient basis for reaching an expert opinion under these

circumstances.  (*See, e.g.*, Paxton Dep. at 24–25, 34–35.)  Paxton surmises, with no analysis of

any data of any kind, that Crews' failure to recover from the alleged encroaching "was through

his own fault." (10/19/10 Paxton Report at 5.) His conclusion that Crews could have avoided

the crash, "[i]if alert and not drowsy," is also speculative given Paxton's lack of knowledge about

the events leading to the crash or Crews' attentiveness at the critical time. (11/15/10 Paxton

Rebuttal Report at 3.)

Nonetheless, Royal Sun may introduce Paxton's testimony that Crews should have been

driving in the right, or outside, lane. (12/1/10 Paxton Rebuttal Report at 3.) Paxton's experience

qualifies him to address whether it would have been customary and/or deemed safer in the

trucking industry for Crews to be in the right lane, as opposed to the middle lane, of a restricted

highway.[8] Whether or not Crews' presence in the middle lane was legal, Paxton's opinion is

relevant to the negligence allegations. After all, many negligence actions stem from perfectly

legal but inadvisable conduct. We therefore grant this motion in part, and deny it in part.

### 4.       Trooper Plouch & Corporal Ramsey

IMSCO seeks to preclude certain testimony from two Arkansas state police officers:

Trooper Jeffrey Plouch and Corporal Jeffrey Ramsey. Both officers arrived at the scene of the

crash within minutes, and Trooper Plouch briefly interviewed Crews at the hospital shortly

thereafter. Corporal Ramsey and Trooper Plouch conducted the subsequent investigation,

including visual inspection of the highway within a day of the accident. Royal Sun intends to

offer testimony from both officers that they did not believe that Crews was forced off the road as

he claimed in his interview with Trooper Plouch. Indeed, Trooper Plouch and Corporal Ramsey

---

[8] Apparently the pertinent section of I-30 was "restricted," meaning that no trucks are
permitted to drive in the leftmost, or inside, lane.

testified that they suspect Crews was inattentive or asleep while driving, leading to the accident. (*See* Plouch Dep. at 31–32; Ramsey Dep. at 41–42.)

IMSCO asks us to strike any such trial testimony by the officers opining on the cause of the accident. (Def.'s MIL re: Plouch at 5–13 & MIL re: Ramsey at 8–10.) IMSCO primarily argues that neither Trooper Plouch, nor Corporal Ramsey employed reliable methods in reaching their opinion that Crews was not forced off the road. For example, the officers admittedly are not accident reconstructionists, did not take photographs or extensive measurements of the accident scene, and acknowledged that they are not sure precisely what caused the crash because they were not in the cab with Crews. (*See* Plouch Dep. at 21–32; Ramsey Dep. at 8–14, 41–54, 58.) Trooper Plouch and Corporal Ramsey opine that Crews was not forced off the road largely because the lane in which he was traveling—the middle lane—lacked tire marks that might suggest evasive steering. IMSCO contends, however, that both parties' experts in this case agree that the absence of tire marks in the middle lane does not dictate the officers' conclusion. Moreover, both officers stated that their investigation did not produce any official finding, other than the undisputed fact that only Crews' truck was impacted in the crash. (Plouch Dep. at 31; Ramsey Dep. at 43–45, 58.)

While the officers are not professional, expert reconstructionists, both have training and significant experience with accident investigation as law enforcement officers. Both were present at the scene of the accident within a short period of time thereafter and viewed the highway conditions and tire marks repeatedly. Although IMSCO argues that the officers' shared opinion that Crews was distracted at the time of the crash is based on a misinterpretation of the

absence of skid marks, the evidence is not so clear-cut.  IMSCO's expert asserts that Crews could

have completed an aggressive steer to the left without leaving marks on the roadway (10/21/10

Fenton Report at 3), but Royal Sun's expert finds the lack of tire marks to be entirely irrelevant

(11/12/10 Fogarty Rebuttal Report at 7 ("[T]he lack of tire mark evidence on the roadway is

neither evidence against or evidence for [Crew's] statement.").[9]  We cannot agree with IMSCO

that the officers' interpretation of the marks is wholly speculative.  Under the circumstances, we

find sufficient indicia of reliability to allow the officer's testimony about the cause of the crash,

based on their experience and observations.  The officers' conclusion will surely invite vigorous

cross-examination, but the most appropriate course of action is to allow the testimony for

whatever it may be worth.  The perceived shortcomings of the officers' testimony may affect its

weight and credibility, but not its admissibility.  Such testimony is relevant to the remaining

issues to be tried, and we perceive no undue prejudice if it is introduced, especially at a bench

trial.  Accordingly, these motions are denied.

### 5.      Stephen Fenton

Royal Sun objects on several grounds to the proposed testimony of IMSCO's accident

reconstructionist, Stephen Fenton.  According to Royal Sun, Fenton should be precluded from

testifying about various scenarios he generated using the PC Crash computer software because he

used flawed factual inputs to run the program.  (Pl.'s MIL re: Fenton at 8–16.)  As such, Royal

---

[9] Fogarty also explained that the impact angle of the accidence "did not require an aggressive steer to the left."  (11/12/10 Fogarty Rebuttal Report at 7.)  Thus, according to Fogarty, Crews did not veer sharply at all but, even if he did, the lack of road marks would not necessarily indicate so.  (*Id.*)

Sun contends that his opinions based on the scenarios are unreliable.  (*Id.* at 8–10, 15–16.)  Royal

Sun further argues that IMSCO failed to properly disclose two of Fenton's simulations as

required by Rule 26(a)(2)(B).  (*Id.* at 17–20.)  Royal Sun asserts that because it had no

opportunity to conduct discovery as to these two simulations, Fenton cannot rely on them at trial

even if we allow him to testify as to the other simulations.  (*Id.*; Pl.'s Reply re: Fenton at 6–7.)

We consider each argument in turn.

A.     *Reliability of the PC Crash Simulations*

In preparing his expert report, Fenton utilized the PC Crash software, which "allows the

reconstructionist to enter vehicle and scene geometry, roadway surface conditions, and driver

steering and braking inputs to analyze the consistency of various scenarios with specific physical

evidence."  (10/21/10 Fenton Report at 12–13.)  Fenton ran eight to ten scenarios using the PC

Crash program to conduct his initial analysis of the crash.  (Pl.'s MIL re: Fenton at 1–2; *see also*

Fenton Dep. at 37–40, 42.)  Fenton concluded that one of these scenarios best matched the actual

path traveled by the tractor trailer and, moreover, confirmed Crews' statement that he had been

forced over into the left lane by another vehicle.  (10/21/10 Fenton Report at 2–3, 14–15.)

Fenton further opined that the physical evidence does not support Royal Sun's theory that Crews

could have avoided the accident but was asleep or otherwise inattentive at the wheel.  (*Id.*)

Royal Sun challenges Fenton's conclusions and use of PC Crash in this instance,

however.  Relying on its own expert, Royal Sun stresses that Fenton lacked sufficient factual data

about the crash to properly run the simulations.  (Pl.'s MIL re: Fenton at 10–15.)  Royal Sun

points out that Fenton relied on default values assigned by PC Crash in several instances where

he lacked known data concerning crash variables.  (Pl.'s MIL re: Fenton at 10–15.)  For example,

Fenton relied on the program default for ABS brakes without questioning its effect on the results.

(*Id.* at 12.)  Fenton also assigned his own values to other factors, such as steering and braking

inputs, vehicle speed, and the coefficient of friction between the tires and the roadway surface.

(*Id.* at 12–14.)  According to Royal Sun, these assumptions render Fenton's methodology

unreliable and his conclusion speculative.

      In opposition to the motion, IMSCO submitted a declaration from Fenton addressing

Royal Sun's criticisms and describing how he selected certain input for the simulations.  (*See*

3/3/11 Fenton Decl.)  Among other things, Fenton explains that he assigned the coefficient of

friction based on a standard figure commonly used by accident reconstructionists for dry

roadways, which he adjusted to account for the difference between passenger car and tractor

trailer tires.  (*Id.* ¶¶ 45–47.)  Fenton asserts that, based on his experience, a surface test of the

relevant stretch of I-30 to calculate the exact coefficient would be impractical and unnecessary.

(*Id.* ¶ 47.)  Fenton additionally explains why ABS brakes would not have had any meaningful

effect on the motion of Crews' tractor trailer and, thus, including it in the simulation was also

unnecessary.

      The crux of IMSCO's position is quite simply that Fenton's methodology is reliable

because the simulation produced results that matched the physical data.  (*See* 3/3/11 Fenton Decl.

¶¶ 28–29.)  Royal Sun contends that this logic is circular, but we disagree.  Fenton used all

available empirical data, intentionally supplemented it with accepted or otherwise reasonable

default variables, and used PC Crash to reverse engineer scenarios that tested the parties'

competing theories. (*See* 10/21/10 Fenton Report at 3–15; 3/3/11 Fenton Decl. ¶¶ 20–26, 35–49.) As a practical matter, reconstruction of such a crash inherently involves working backwards in this fashion. Regardless, Fenton states that PC Crash has been validated and is widely accepted in his field for this type of accident and, moreover, that his methodology is supported by the relevant literature. (3/3/11 Fenton Decl. ¶¶ 12, 15, 17–19, 22, 25–26, 37, 46–47, 49.) Royal Sun does not contest this point in its reply brief.

Instead, Royal Sun stresses that Fenton acknowledged that there may be other scenarios—beyond the eight or ten he ran—that might have better matched the physical characteristics of the crash. (Pl.'s MIL re: Fenton at 15–16; Pl.'s Reply re: Fenton at 6.) In his deposition, Fenton responded "I don't know" when asked whether other, better scenarios existed that he did not generate through PC Crash. (Fenton Dep. at 44–46.) This qualification, however, does not affect the admissibility of testimony based on the scenarios he did run. Fenton need not disprove all other explanations for his testimony to be considered. "While an expert should address evidence that contradicts his conclusions, it is not required that an expert categorically exclude each and every possible alternative cause in order to render the proffered testimony admissible." *Cedar Petrochems., Inc.*, 769 F. Supp. 2d at 287 (internal quotation omitted). Perhaps Fenton "could have bolstered his conclusions through conducting [additional] experiments," but that issue goes to the weight of his testimony, not its admissibility. *Id.* (further noting that an expert's grounds "do not have to be perfect"); *see Duling v. Gristede's Operating Corp.*, 267 F.R.D. 86, 94–95 (S.D.N.Y. 2010) (holding that challenges to "various aspects of the experts' procedures in conducting their statistical evaluations" concerned the "impact and weight of the alleged flaws" rather than the admissibility); *see also McCullock*, 61 F.3d at 1043;

*Mayancela*, 2010 WL 774942, at *3.  Royal Sun will have the opportunity to question Fenton about his methodology at trial, including why he selected certain inputs for PC Crash and why he decided not to run more than ten scenarios in conducting his analysis.

Although Royal Sun cites to a number of cases where courts rejected testimony based on PC Crash simulations, these cases are easily distinguishable and we need not address them. Based on our review of his reports and declaration, as well as pertinent caselaw, Fenton's methodology and use of PC Crash contain no serious flaws that would warrant exclusion of his testimony.  *In re Fosamax Prods. Liability Litig.*, 645 F. Supp. 2d at 173 (citing *Amorgianos*, 303 F.3d at 267).  Accordingly, we deny Royal Sun's motion to preclude Fenton from testifying about his initial PC Crash simulations.

### B.    Compliance with Rule 26(a)(2)(B)

Royal Sun next argues that Fenton should not be permitted to testify about two additional simulations that IMSCO allegedly failed to fully or timely disclose in violation of Rule 26.  (Pl.'s MIL re: Fenton at 16–20; Pl.'s Reply re: Fenton at 6–7.)  Rule 26(a)(2)(B) requires an expert witness intending to testify at trial to provide a written report that includes, *inter alia*: "(1) a complete statement of all opinions the witness will express and the basis and reasons for them; (2) the facts or data considered by the witness in forming them; [and] (3) any exhibits that will be used to summarize or support them."  Fed. R. Civ. P. 26(a)(2)(B)(i)-(iii).  Failure to comply with this disclosure requirement, within the discovery schedule set by the court, may warrant exclusion of the evidence.  *See* Fed. R. Civ. P. 37(c)(1).

Here, the deadline for the filing of expert disclosures and reports was October 23, 2010.

Rebuttal reports were due November 23, 2010, with depositions to be completed by December 7, 2010.  (*See* 11/17/10 Order, Dkt. No. 82 (granting extension for depositions, particularly in light of the Thanksgiving holiday)).)  With these dates and principles in mind, we consider whether IMSCO's disclosures satisfy Rule 26.[10]

### 1.    Avoidance Simulation

Fenton ran the first of these two disputed supplemental simulations in response to a report submitted on October 20, 2010 by one of Royal Sun's experts, Dr. Jesuit.  (*See* 10/20/10 Jesuit Report; 11/23/10 Fenton Report at 2–5.)  To test Dr. Jesuit's theories, Fenton completed additional analysis with PC Crash, generating what the parties refer to as the Avoidance Simulation.  (11/23/10 Fenton Rebuttal Report at 4–5.)  Fenton discussed the Avoidance Simulation in his November 23, 2010 supplemental report and his December 6, 2010 deposition.  (*Id.*)  IMSCO disclosed the underlying data used for the Avoidance Simulation on December 3, 2010—one business day before Fenton's deposition.

Royal Sun insists that the Avoidance Simulation data was disclosed "a month and a half late."[11]  (Pl.'s MIL re: Fenton at 18; *see* Pl.'s Reply re: Fenton at 7.)  This characterization is plainly inaccurate, as it references the October 23, 2010 deadline for initial reports rather than the

---

[10] The parties have apparently disputed whether IMSCO was required to turn over Fenton's simulations themselves, and not just the input and output data.  (*See* 2/10/11 Eagan Decl., Ex. 29; Opp'n to Pl.'s MIL re: Fenton at 19–24.)  Royal Sun contends that the actual simulations must be provided pursuant to Rule 26(a)(2)(B), while IMSCO argues that the simulations are not discoverable because they are not trial exhibits.  We need not reach this issue because Royal Sun's motion does not squarely raise it.  (Pl's Reply re: Fenton at 4.)

[11] Royal Sun challenges the timing of the Avoidance Simulation disclosures but not their thoroughness or sufficiency under Rule 26(a)(2)(B).

pertinent November 23, 2010 deadline for rebuttal reports.  Fenton generated the Avoidance

Simulation in response to Dr. Jesuit's theories, specifically for his November 23, 2010 rebuttal

report.  Although Royal Sun condemns IMSCO's failure to provide the data underlying the

Avoidance Simulation until December 3, 2010, we hardly consider this delay of six business days

to be egregious.  Nonetheless, in light of the relatively tight schedule for rebuttal reports and

expert deposition—especially with an intervening holiday—we recognize that this otherwise

unremarkable delay impaired Royal Sun's ability to fully prepare for Fenton's deposition.

Accordingly, we will allow Royal Sun the opportunity to redepose Fenton as to the Avoidance

Simulation as set forth below.  Provided that IMSCO makes Fenton available for redeposition,

however, we will not preclude his testimony about the Avoidance Simulation.

### 2.        Fogarty Simulation

Fenton ran the second disputed simulation to evaluate testimony given by one of Royal

Sun's experts, Dr. Fogarty.  At his December 6, 2010 deposition, Dr. Fogarty testified that Crews

had not braked at all prior to impact with the center lane divider.  (*See* 3/3/11 Lindsay Decl.

¶ 10.)  Sometime thereafter, Fenton ran an additional simulation, known as the Fogarty

Simulation, to test the new theory articulated by Dr. Fogarty at the deposition.  (*Id.* ¶ 10.)  Fenton

did not prepare a supplemental report regarding the Fogarty Simulation because it confirmed

Fenton's earlier conclusion "that the tractor trailer would not follow the path it took without the

inputs of braking pre-impact and steering to the right."  (*Id.* ¶ 10.)  In addition, counsel

admittedly neglected to give Royal Sun the relevant input and output files until February 1, 2011.

(*Id.* ¶¶ 10–11 (explaining that counsel overlooked the disclosure but responded within roughly

three business days once reminded of the obligation on January 26, 2011).)

We agree with Royal Sun that IMSCO's failure to promptly provide a supplemental report and underlying data under these circumstances does not comport with Rule 26. The record does not indicate how Royal Sun learned about the Fogarty Simulation, but no formal disclosure has yet occurred. Royal Sun simply cannot prepare for trial as to the Fogarty Simulation without further discovery. Rather than strike Fenton's potential testimony on this topic at this time, however, we grant IMSCO one final opportunity to fulfill its Rule 26 obligations. If IMSCO intends for Fenton to rely on or testify about the Fogarty Simulation at trial, it must deliver a supplemental expert report no later than September 9, 2011. As with the Avoidance Simulation, IMSCO must also make Fenton available for deposition about the Fogarty Simulation. This deposition, covering both simulations, may not exceed four hours and must take place on or by September 23, 2011. No extensions or changes to the trial schedule will be permitted.

For the reasons set forth above, Royal Sun's motion is granted in part and denied in part. We will not limit Fenton's testimony concerning the initial eight to ten PC Crash scenarios he conducted. With respect to the Avoidance and Fogarty Simulations only, Fenton's testimony will be precluded unless IMSCO provides the additional discovery outlined above.

## B.   HEARSAY OBJECTIONS

Having resolved the parties' motions concerning expert testimony, we turn to briefly address several hearsay objections.

### 1.   IMSCO Injury Report

IMSCO seeks to exclude a description of the accident that originated in an IMSCO

internal report prepared shortly after the accident.  (Def.'s MIL re: Injury Report.)  Although later

incorporated in other documents, the description first appears in an Injury Report prepared by

Edward Riley, Crews' supervisor at IMSCO, in accordance with IMSCO's workers'

compensation record-keeping procedures.  (*Id.*, Ex. 2 at 1.)  IMSCO argues that the description is

hearsay within hearsay and that no exception to the hearsay rule applies.  (Def.'s MIL re: Injury

Report at 4–5.)  Royal Sun argues that the report is a business record and that the description in

the report is an admission by IMSCO through its agent, Riley.  (Opp'n to Def.'s MIL re: Injury

Report at 8–10.)  We agree with Royal Sun and deny IMSCO's motion in limine.

The crux of IMSCO's objection pertains to the use of the word "overcorrect" in the

description of the accident.  In pertinent part, the description provides:

> Driver states that another tractor came into his lane of travel causing our driver to veer
> into the left lane.  Driver then tried to over correct [sic] and struck the wall / guard rail.

(Def.'s MIL re: Injury Report, Ex. 2 at 1.)  Ridley prepared this portion of the report based on his

conversation with Trooper Plouch in the hours after the accident.  (Ridley Dep. at 25.)  In that

conversation, Trooper Plouch told Ridley what Crews had told him about the accident when

Trooper Plouch spoke to Crews in the hospital.  (*Id.*)  Ridley testified at his deposition that

Trooper Plouch did not use, nor did he describe Crews as using, the word "overcorrect."  (*Id.* at

25–26.)  Ridley stated that "[t]hat was my terminology."  (*Id.* at 25.)  Ridley went on to state,

however, that he uses the word overcorrect "synonymously with avoiding."  (*Id.* at 25–26.)

IMSCO argues that Ridley's use of the word "overcorrect" in the Injury Report is hearsay,

because Ridley was merely recounting what Trouper Plouch said regarding his conversation with

Crews.  (Def.'s MIL re: Injury Report at 4–5.)  IMSCO admits, however, that the word appears in

its own business record.  Rule 803(6) allows admission of:

> A memorandum, report, record, or data compilation, in any form, of acts, events,
> conditions, opinions, or diagnoses, made at or near the time by, or from information
> transmitted by, a person with knowledge, if kept in the course of a regularly conducted
> business activity, and if it was the regular practice of that business activity to make the
> memorandum, report, record or data compilation, all as shown by the testimony of the
> custodian or other qualified witness, or by certification that complies with Rule 902(11),
> Rule 902(12), or a statute permitting certification, unless the source of information or the
> method or circumstances of preparation indicate lack of trustworthiness.

Fed. R. Evid. 803(6).  Despite this exception's applicability to the report as a whole, IMSCO

contends that Ridley's description of the accident was not made by a "person with knowledge"

and is therefore hearsay not qualifying for any exception.  (Def.'s MIL at 5.)

On the other hand, Royal Sun argues that Ridley's use of the word "overcorrect" was his

own formulation and is thus an admission pursuant to Rule 801(d)(2).  (Opp'n to Def.'s MIL re:

Injury Report at 8–10.)  Rule 801(d)(2) excludes from the definition of hearsay statements any

statement that is

> [O]ffered against a party and is
> (A) the party's own statement, in either an individual or a representative capacity or
> (B) a statement of which the party has manifested an adoption or belief in its truth, or
> (C) a statement by a person authorized by the party to make a statement concerning the
> subject, or
> (D) a statement by the party's agent or servant concerning a matter within the scope of the
> agency or employment, made during the existence of the relationship[.]

Royal Sun also points to a Second Circuit case, *Schering Corporation v. Pfizer*, which holds that

a "party admission containing hearsay is admissible where . . . the admission draws inferences

from the underlying hearsay and thus 'manifest[s] an adoption or belief in its truth.'"  189 F.3d

218, 239 (2d Cir. 1999).  In *Schering*, the Second Circuit vacated and remanded the district

court's decision to exclude an analysis of surveys of several doctors in a pharmaceutical false

claims case.  *Id.*  The party that had conducted the survey analysis opposed introducing it in to

evidence.  Although the district court concluded that the survey analysis should be excluded as

"no more than a convenient summary of the research, not representing a conclusion by [the

party,]" the Second Circuit concluded otherwise.  *Id.*  The Second Circuit allowed the survey

analysis to be admitted, because the analysis reached conclusions drawn from an "inductive

inference" about the surveys' reliability.  *Id.*  By making this inference, the Court held that the

party had "manifested a belief in the trustworthiness" of the underlying statements in the surveys.

*Id.*  Thus, the survey analysis was a party admission and not hearsay, even though it relied on

hearsay statements.  *Id.*

We find *Schering* instructive to the situation now before us.  Although Ridley's

description of the accident in the Injury Report relied on Trooper Plouch's recitation of his

conversation with Crews, which is arguably two layers of hearsay, Ridley's use of the word

"overcorrect" was entirely his own formulation.  As in *Schering*, Ridley's conclusion that Crews

"overcorrect[ed]"—despite neither Trooper Plouch or Crews saying that word—is an

independently derived inference that clearly "manifest[s] a belief in the trustworthiness" of the

underlying information.  189 F.3d at 239.  And while Ridley attempted to minimize his word

choice at his deposition by saying that he uses the words "overcorrect" and "avoiding" as

synonyms, we find this testimony dubious.  The relevant portion of the Injury Report contains

two sentences describing two separate actions.  In the first sentence, the description recounts

Crews having to "veer into the left lane" away from another tractor trailer.  In the next sentence,

the description describes Crews as having "tried to over correct and struck the wall / guard

rail[.]"  Ridley's description of "veer[ing]" followed by "over correct[ing]" belies his assertion

that he uses overcorrecting to mean avoiding.  When describing a response to an encroaching tractor trailer, "veer" is much more akin to "avoid" than "overcorrect" is.  If "overcorrect" also means avoid, then the second sentence would be redundant.

It is clear, then, that Ridley's insertion of the word "overcorrect" was his attempt to synthesize the information provided to him by Trooper Plouch.  In performing this synthesis, Ridley accepted the veracity of Trooper Plouch's recitation of his conversation with Crews and proceeded to draw inferences based on the substance of that conversation.  Because it was Ridley who inferred that Crews "overcorrect[ed]," this statement is an admission by IMSCO's agent.  As such, it is not hearsay.  IMSCO's motion in limine is denied.

### 2.    Burn Center Sleep Apnea References

IMSCO seeks to exclude excerpts of and reference to notations in the records of the Arkansas Children's Hospital Burn Center ("Burn Center") indicating that Mr. Crews suffered from obstructive sleep apnea.  (Def.'s MIL re: Burn Center R.)  The notations appear in two records of the Arkansas Children's Hospital: the Burn Center Patient Database (Pl.'s Ex. 20) and the Pre-Anesthetic Consult (Pl.'s Ex. 22).  IMSCO argues that the notations referring to obstructive sleep apnea are hearsay and do not fall within an exception to the hearsay rule. (Def.'s MIL re: Burn Center R. at 5.)  Royal Sun contends that the notations are excepted because they are "[r]ecords of regularly conducted activity."  Fed. R. Evid. 803(6).  (Opp'n to Def.'s MIL re: Burn Center R. at 3.)  We agree with Royal Sun that the notations indicating a diagnosis of obstructive sleep apnea found in the records of the Burn Center fall within the business records exception.

IMSCO does not dispute that the notations are included in the business records of the hospital.  (Def.'s MIL re: Burn Center R. at 5.)  As discussed, Rule 803(6) provides for the admission of a record of a regular business activity "unless the source of information or the method or circumstances of preparation indicate a lack of trustworthiness."  Courts generally accept hospital records as "[r]ecords of regularly conducted activity" falling within this hearsay exception.  *See, e.g., Middleton v. Rivera*, No. 05 C 3145, 2010 WL 4242852 at *8 (S.D.N.Y. Mar. 9, 2010) ("[H]ospital records are generally admissible in evidence as prima facie evidence of the facts contained therein."); *Hodges v. Keane*, 886 F.Supp. 352, 356 (S.D.N.Y. 1995) ("Medical records[ ] . . . can be admissible under Federal Rule of Evidence 803(6), provided they are prepared in the regular course of business, near the time of occurrence, by a person with knowledge and are properly authenticated.").

Despite the applicability of the Rule 803(6) exception to the Burn Center records as a whole, IMSCO contends that the notations referring to sleep apnea should be excluded.  IMSCO argues that the notations do not fall within the exception because the nurse or patient care planner who made them lacked the qualifications to make such a diagnosis.  (Def.'s MIL re: Burn Center R. at 6.)  In *United States v. Re* the Second Circuit stated that "the 'circumstances of the making' [of a business record] have a bearing only on the weight to be given the writing and not on its admissibility."  336 F.2d 306, 313 (2d Cir. 1964) (referencing admission of evidence pursuant to 28 U.S.C.A. § 1732); *see also In re WorldCom, Inc. Sec. Litig.*, No. 02 C 3288, 2005 WL 375313, at *9 (S.D.N.Y. Feb. 17, 2005) (admitting a financial restatement despite evidence of flaws, which affect the weight given to the document but not admissibility); *Stroud v. Roper Corp.*, No. 88 C 1093, 1990 WL 115610, at *3 (S.D.N.Y. Aug. 9, 1990) (reasoning that because

of the presumption of trustworthiness for hospital records, any errors in testing procedures go to the weight of the records rather than admissibility).  Specifically, other circuit courts have not required that to be admissible medical records must "state affirmatively the qualifications of the diagnostician or of the technician and the steps taken in running the test." *Thomas v. Hogan*, 308 F.2d 355, 360 (4th Cir. 1962) (analyzing the introduction of test results determining the plaintiff's blood alcohol level).  We agree with these authorities that a diagnosis contained within a hospital record is admissible even if there are doubts about the diagnostician's qualifications.  The debate as to the qualifications of the diagnostician affects the weight to be given the evidence but not its admissibility.

Alternatively, IMSCO contends that the notations referring to sleep apnea should be excluded because "the source of information or the method or circumstances of preparation indicate a lack of trustworthiness."  Fed. R. Evid. 803(6).[12]  Indeed, in *Saks International Inc. v. M/V Export Champion*, the Second Circuit stated that "[t]he principal precondition to admission of documents as business records pursuant to Fed.R.Evid. [sic] 803(6) is that the records have sufficient indicia of trustworthiness to be considered reliable."  817 F.2d 1011, 1013 (2d Cir. 1987).  IMSCO primarily contends that the notations lack reliability because the diagnosis conflicts with the opinions of the "people that knew Mr. Crews best in the world."  (Def.'s Reply

--------

[12] IMSCO also argues the nurse or patient care planner lacked the personal knowledge necessary to make the record, pursuant to Fed. R. Evid. 803(6).  This argument is specious. There is no foundational requirement that the maker of a record have personal knowledge of everything contained within the record, so long as the business regularly relied upon the source of the information to provide such knowledge.  *Saks Int'l Inc. v. M/V Export Champion*, 817 F.2d 1011, 1013 (2d Cir. 1987).  Hospitals regularly solicit information about the patient's symptoms and medical history from family members and rely on that information in making entries in the patient's records.

re: Burn Center R. at 5.)[13]  That Mrs. Crews and other doctors who have examined Mr. Crews did

not diagnose sleep apnea does not prove, however, that Mr. Crews did not suffer from the

disorder.  Indeed, Dr. Lee admits that she did not order a sleep study despite Mr. Crews

exhibiting risk factors for the condition.  (Lee Dep. at 49.)  Disagreement with a diagnosis does

not make it inherently unreliable or untrustworthy, particularly when the parties challenging the

diagnosis did not take the steps necessary to guarantee an accurate diagnosis.

Contrary to IMSCO's contention, the notations in the Burn Center records display

significant indicia of trustworthiness.  In the Advisory Committee's note to Rule 803(6), the

committee stated that the reliability of business records is supplied "by actual experience of

business in relying upon them."  Christopher B. Mueller & Laird C. Kirkpatrick, 2010 Federal

Rules of Evidence With Advisory Committee Notes and Legislative History 224 (2010).

Similarly, the Second Circuit has stated that "[b]usiness records are admissible if witnesses

testify that the records are integrated into an office's records and relied upon in its day-to-day

operations."  *United States v. Mendel*, 746 F.2d 155, 166 (2d Cir. 1984); *see also United States v.*

*Rybicki*, 38 F.App'x 626, 632 (2d Cir. 2002) (admitting cards that were frequently relied on for

the success of a criminal venture because this reliance demonstrated trustworthiness);

*WorldCom*, 2005 WL 375313, at *7 (admitting a financial restatement upon the determination

that it was trustworthy because it was created "with the intention that it be relied upon").

---

[13] Mrs. Bonita Crews, the deceased's wife, testified that she informed a hospital official
that her husband snored but not that he had sleep apnea.  (Crews Dep. at 30–31.)  Dr. Asha
Parikh, Mr. Crews' personal physician, and Dr. Nicola Lee, a medical examiner for the
Department of Transportation, both examined Mr. Crews to license him as a commercial driver.
Both doctors testified that Mr. Crews did not report, and they did not notice, any problems that
would indicate Mr. Crews had sleep apnea.  Neither doctor ordered further diagnostic tests.
(Parikh Dep. at 46; Lee Dep. at 20–21.)

Specifically, hospital record entries are trustworthy because "[h]uman life will often depend on the accuracy of the entry, and it is reasonable to presume that a hospital is staffed with personnel who competently perform their day-to-day tasks." *Thomas*, 308 F.2d at 361.  The Burn Center routinely relies on nurse and patient care planner notes in the records to treat patients, indicating that such notations are trustworthy.

To be sure, the Second Circuit has occasionally excluded notations in medical records as unreliable. *Romano v. Howarth*, 998 F.2d 101, 108 (2d Cir. 1993).  For instance, in *Romano*, a nurse recorded progress notes in a prisoner's psychiatric file based on statements provided by a corrections officer.  *Id*. at 103.  Reasoning that inclusion in medical records is a guaranty only of the accuracy of the nurse's notes and not of the information supplied by the corrections officer, who was a party to the litigation, the Court held the notations in the medical record were hearsay and should have been excluded from trial.  *Id*. at 108.  But unlike in *Romano*, where the source of information for the prison medical records indicated a lack of trustworthiness because of the corrections officer's interest in the case, there is no reason to doubt the trustworthiness of Mrs. Crews' statements to the nurse or patient care planner.  Neither party challenges the reliability of those statements, and any information related by a patient's wife to hospital officials for the purposes of medical treatment carries the guarantee of trustworthiness motivated by her interest in seeking effective treatment.

The notations referring to sleep apnea made by a nurse or patient care planner are diagnoses contained within "[r]ecords of regularly conducted activity" and, as such, they are hearsay that fall within the business records exception.  There is no indication that the notations or their source are untrustworthy, and any questions about the correctness of the diagnosis in the

record go to the weight of the evidence rather than its admissibility.  Accordingly, IMSCO's motion in limine is denied.

### 3.   Crews' Statement to Trooper Plouch

In this final motion, Royal Sun seeks to exclude Crews' statement to Trooper Plouch that he had been forced into the inner lane by another vehicle.  Crews made this statement at the emergency room approximately one hour after the accident.  (Pl.'s MIL re: Crews' Statement at 1.)  This account has since been incorporated into a variety of documents including the UPS Report of the Accident, the IMSCO Injury Report, and later IMSCO emails.  (*See* Pl.'s MIL re: Crews' Statement, Exs. 4–6).  Royal Sun argues that the statement is hearsay and should be excluded because it fits neither the dying declaration nor the excited utterance exceptions.  *See* Fed. R. Evid. 803(2), 804(b)(2).  Royal Sun asserts that the statement was neither a dying declaration—because Crews did not believe that death was imminent when he made it—nor an excited utterance—because too much time had elapsed since the initial shock of the accident. (Pl.'s MIL re: Crews' Statement at 2).  IMSCO contends that the statement "falls into a penumbra between the two exceptions to the hearsay rule" as the statement was made while Crews was still in shock from the accident and should be admitted.  (Opp'n to Pl.'s MIL re: Crews' Statement at 2).  We agree with IMSCO.

To admit a hearsay statement as an excited utterance, Rule 803(2) requires that the statement "relat[e] to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."  Fed. R. Evid. 803(2); *Mohamed v. Laz Parking*, 79 Fed. Appx. 482, 483 (2d Cir. 2003).

Royal Sun contends that Crews' statement does not meet this standard.  Royal Sun points

out that, according to Trooper Plouch, Crews "didn't seem to be in a lot of pain" during their

interview and thus was neither imminently fearful for his life, nor under the stress of the crash.

(Pl.'s MIL re: Crews' Statement at 1.)  While instructive, Trooper Plouch's observation should

not be viewed as a dispositive characterization of Crews' condition.  The severity of the accident,

together with Royal Sun's admission that the statement occurred only one hour and five minutes

after Crews was extricated from the burning truck, make it highly likely that Crews was still

under the stress of the accident.  Thus, the statement is admissible as an excited utterance.[14]

In support of its position, Royal Sun cites to *Katona v. Federal Express*, claiming that to

be admissible "the utterance must have been before there has been time to contrive and fabricate,

i.e., while the nervous excitement may be supposed still to dominate and the reflective powers to

be yet in abeyance."  *Katona v. Federal Express Corp.,* No. 95 C 10951, 1998 WL 126059, at *4

(S.D.N.Y. Mar. 19, 1998).  While both *Katona* and the current motion involve statements made

following an accident, but prior to their declarant's eventual death, the facts of *Katona* are

distinguishable.

As for the severity of the accident, the drivers in *Katona*—unlike Crews—drove off

shortly after the collision, while a passenger in Katona's car simply left the scene by taxi to

continue with her day.[15]  Lacking severe injury and property damage, there is little doubt that the

accident did not generate nearly the excitement and/or stress of the accident currently at issue.

---

[14] Because we have held that the statement can be included as an excited utterance, we need not evaluate the admissibility of the statement a dying declaration.

[15] While the *Katona* opinion strongly implies that Katona drove the vehicle both from the scene of the accident to a restaurant, and from the restaurant home, the facts are never specifically addressed.

*Id*.  In contrast, Crews was pulled from the burning tractor trailer after suffering what proved to be fatal injuries and rushed to the hospital.  The magnitude of Crews' accident generated extraordinary stress and strain far greater than the inconvenience experienced by the parties involved in *Katona*.

Moreover, aside from the excited utterance exception, Crews' statement to Trooper Plouch is admissible under the residual hearsay exception of Rule 807.[16]  Interpreting this rule, the Second Circuit allows for the admissibility of a hearsay statement if the evidence fulfills five requirements: "trustworthiness, materiality, probative importance, [best serves] the interests of justice, and notice."  *Parsons v. Honeywell Inc.,* 929 F.2d 901, 907 (2d Cir.1991); *U.S. v. Harwood*, 998 F.2d 91, 98 (2d Cir. 1993).

The fact that Crews provides the only eyewitness account of the accident, the severity of the accident, and the timing of the interview are all indicia of the statement's materiality and trustworthiness.  As discussed above, only a short interval of time had elapsed between when the statement was made and when Crews suffered life-threatening injuries, making it less likely he fabricated a story.  The statement is also material and probative, as the decision regarding whether Crews was at fault for the collision is vital to both parties' claims and any negligence determination.  The inclusion of the statement best serves the interest of justice, as the

---

[16] Specifically, Rule 807 requires that "(A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can produce through reasonable efforts; and (C) the general purposes of these rules and the interests of justice are best served by admission of the statement into evidence."  Fed. R. Evid. 807.  The statement satisfies all three of these qualifications.  First, the statement goes to the material fact of whether or not another vehicle cut off Crews, rendering him unable to avoid the accident.  Second, Crews' eyewitness statement is more probative than any other piece of evidence regarding what transpired inside the tractor cab.  Third, the inclusion of the statement serves the interests of justice for the reasons discussed herein.

unfortunate fact that Crews succumbed to his injuries should not preclude IMSCO from

introducing statements from the only available eyewitness.  Lastly, the notice requirement has

been met, as the parties have both briefed this issue and neither party would be unduly surprised

by its inclusion.  While we acknowledge that this exception should be applied "in the rarest of

cases," Crews' statement meets the three stated requirements of Rule 807 as well as the five

essential criteria relied upon by the Second Circuit opinion  *U.S v. Cardascia*, 951 F.2d 474, 489

(2d Cir. 1991); *U.S. v. DeVillio*, 983 F.2d 1185, 1190 (2d Cir. 1993).  Royal Sun's motion in

limine is therefore denied.

**CONCLUSION**

For the reasons set forth above, IMSCO's motions in limine as to Dr. Richard Millman

(Dkt. No. 115), Dr. William Fogarty (Dkt. No. 118), Corporal Jeffrey Ramsey (Dkt. No. 124),

and Trooper Plouch (Dkt. No. 112) are denied.  IMSCO's motion concerning the testimony of

Paul Paxton (Dkt. No. 121) is granted in part and denied in part.  Paxton may testify about the

propriety of Crews' driving in the middle lane of I-30.  IMSCO's motions seeking to exclude

certain references in the injury report (Dkt. No. 127) and Burn Center documents (Dkt. No. 156)

are denied.

Royal Sun's motion to limit the testimony of Stephen Fenton (Dkt. No. 109) is denied,

pending the additional discovery described above.  IMSCO must provide Fenton's supplemental

concerning the Fogarty Simulation no later than September 9, 2011.  Moreover, IMSCO must

make Fenton available for a deposition, lasting no more than four hours, as to the Avoidance and

Fogarty Simulations on or by September 23, 2011.  Failure to comply with this limited discovery

order will result in restriction of Fenton's testimony.  Finally, Royal Sun's motion in limine

seeking to strike Crews' statement to Trooper Plouch (Dkt. No. 153) is denied.[17]

SO ORDERED:

_____
Marvin E. Aspen
United States District Judge

Dated: Chicago, Illinois
        August 31, 2011

---

[17] As stated in the body of this opinion, our various rulings admitting testimony or other evidence does not preclude argument at trial regarding what weight should be afforded to admitted evidence.